UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

CHARLES NASH,                          )
                                       )
        Petitioner,                    )
v.                                     )        No. 1:14-CV-246-HSM-SKL
                                       )
SHAWN PHILLIPS,[1]                     )
                                       )
        Respondent.                    )

## MEMORANDUM OPINION

This is a pro se prisoner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 [Doc. 1]. Respondent filed a response in opposition thereto, as well as a copy of the state record [Docs. 11 and 12]. Petitioner filed a reply [Doc. 18]. Petitioner has also filed a motion to ascertain status of the case [Doc. 20] that will be **GRANTED** to the extent that this memorandum opinion and a judgment order will enter and Respondent filed a motion to substitute attorney [Doc. 21] that will be **GRANTED** for good cause shown therein. For the reasons set forth below, however, Petitioner's § 2254 petition [Doc. 1] will be **DENIED** and this action will be **DISMISSED WITH PREJUDICE.**

## I.      PROCEDURAL HISTORY

On October 26, 2007, a Hamilton County jury found Petitioner guilty of two counts of first degree murder and one count of especially aggravated robbery [State Court Record, Attachment 1 p. 101]. Petitioner appealed this conviction, raising only the argument that the trial court should

---

[1] As Petitioner is now incarcerated at the Morgan County Correctional Complex, the proper Respondent is Warden Shawn Phillips. As such, Petitioner's most recent motion to substitute party [Doc. 23] will be **GRANTED** and the Clerk will be **DIRECTED** to substitute Shawn Phillips as Respondent in this matter.

have suppressed his statement to police, as Petitioner asserted that the statement violated his Fifth Amendment right against self-incrimination because he had invoked his right to counsel before giving the statement. *State v. Nash*, No. E2008-00951-CCA-R3-CD, 2009 WL 2461178, at *1 (Tenn. Crim. App. Aug. 12, 2009), *perm. app. denied* (Tenn. Jan 25, 2010). The Tennessee Court of Criminal Appeals ("TCCA") confirmed Petitioner's conviction. *I*d. at 5.

Petitioner later filed a petition for post-conviction relief and an eighty-four page memorandum in support thereof, which the state post-conviction court denied [State Court Record Attachment 18[2] p. 2–86]. In his appeal of this denial, Petitioner argued that trial counsel was ineffective for failing to pursue suppression of Petitioner's statement, not objecting to certain statements during the prosecution's closing argument, and failing to develop duress as a defense for Petitioner.[3] *Nash v. State*, No. E2012-02511-CCA-R3, 2013 WL 5314599, at *5–8 (Tenn. Crim. App. Sept. 20, 2013), *perm. app. denied* (Tenn. Feb. 12, 2014). The TCCA affirmed the post-conviction court's denial of relief. *Id.* at *8.

## II.     BACKGROUND

The following factual background is taken from the TCCA's opinion on direct appeal of Petitioner's conviction and it is limited only to the issue raised therein:

---

[2] While the Court cites Petitioner's pro se appellate brief, it appears from the Court's reading of the record as a whole that this was likely the same brief filed with the post-conviction trial court [State Court Record, Attachment 17 p. 46–49 and Attachment 18].

[3] While Petitioner's post-conviction appointed counsel only raised the three issues listed above in his brief, Petitioner filed a pro se brief setting forth all of the arguments from his original post-conviction petition [State Court Record, Attachment 18],. *See Nash v. State*, No. E2012-02511-CCA-R3, 2013 WL 5314599, at *5 (Tenn. Crim. App. Sept. 20, 2013). The Tennessee Court of Criminal Appeals deemed the issues raised only by Petitioner in his pro se brief as waived, however, relying on Rules 27 (a) and 10(b) of the Tennessee Rules of Appellate Procedure, as well as well-established Tennessee case law. *Id.*

At the hearing on the defendant's first motion to suppress, Detective Ralph Kenneth Freeman with the Chattanooga Police Department testified that on February 25, 2006, he was investigating both Ms. Brown's death and another robbery and that the defendant's "name came up" in connection with both offenses. The defendant's father told Detective Freeman where the defendant would be found; after Detective Freeman found the defendant, he transported the defendant to the police station. The two men spoke on the way to the station, but they did not talk about either of the pending investigations.

Some thirty to forty-five minutes after the defendant arrived at the police station, Detective Freeman and Detective Joe Shaw interviewed the defendant. The interview began, in pertinent part, as follows:

[DET. FREEMAN]: Charles, before I ask you any questions[,] you must understand your rights:
[Reading from the rights waiver form:] *You have the right to remain silent.*
*Anything you say can be used against you in court.*
*You have the right to talk to an* [sic] *lawyer for advice before we ask you any questions and to have him or her with you during questioning.*
*If you cannot afford a lawyer one will be appointed for you before any questioning if you wish.*
*If you decide to answer questions now without a lawyer present you will still have the right to stop answering questions at any time.*
*You also have the right to stop answering questions at any time until you talk to a lawyer.*
Do you understand your rights? Can you read and write? Answer yes for me if ... if you understand your rights.
[DEFENDANT]: Yes.
[DET. FREEMAN]: Okay, can you read and write?
[DEFENDANT]: Yes.
[DET. FREEMAN]: What's your education Charles?
[DEFENDANT]: Hmm, two (2) years of college.
[DET. FREEMAN]: Two (2) years of college. Here's the rights waiver form showing you, just read over that like I just read it and if you want to talk to me just initial every place right there and then sign and date it right there.
(*silence* )
[DET. FREEMAN]: I explained to you also that we were gonna fingerprint you and take your pictures and stuff like that, right? Okay. And you stated that you would like to do that first? Or do you want to continue with this right now?

3

[DET. SHAW]: Hey, I want to go to the john first.

[DET. FREEMAN]: Okay. Hold on just a second, let me see if he's gonna sign that Rights Waiver Form.

[DEFENDANT]: Is it ... uh ... it ain't possible that I could have a lawyer?

[DET. FREEMAN]: Yeah, That's ... and if you want to answer some questions now you can always get a lawyer then or now, whatever, just like what it's saying here but if you want to start talking and then if you decide if you want to stop that's fine too.

[DEFENDANT]: I just want to get on tape that I ain't kill that lady.

[DET. FREEMAN]: Okay. Well, I would like for you to initial and ... and then sign first.

[DEFENDANT]: Uh ...

[DET. SHAW]: The way ... the way this law works, it's called the Miranda Law, okay.

[DEFENDANT]: Uh-hum (yes).

[DET. SHAW]: This guy that got arrested ... he confessed to a crime and then when it came time for court he said well I didn't know I didn't have to say anything so that's why they make us read this to you now.

[DEFENDANT]: Yeah.

[DET. SHAW]: Just so you understand that basically you don't have to answer every question that we ask you. You can answer some of them and not others. You don't have to answer any questions if you don't want but if you want to answer some of them and not others or if you want to tell your side of the story and not answer any questions you can do that too. But before we can listen to you or anything else you have to sign saying you understand what your rights are and you're willing to speak about it even if it's just to tell your side of the story and not to answer questions that's your ... prerogative.

The defendant then signed the rights waiver form and spoke with police. During the interview, he admitted his involvement in the robbery and shooting at the convenience store.

On cross-examination, Detective Freeman testified that he did not interpret the defendant's comment, "it ain't possible that I could have a lawyer," as an indication that the defendant did not understand his rights. He also claimed that the defendant said that he understood his rights. Furthermore, Detective Freeman said that Detective Shaw's statement, "before we can listen to you or anything else you have to sign," did not mean that the defendant had to sign the form even if he did not wish to waive his rights. Detective Freeman said that the defendant "didn't indicate to me that he wanted a lawyer at that time, he indicated to me he wanted to answer

questions without a lawyer." The detective said that had the defendant requested counsel, the interview would have ended.

At the conclusion of the first suppression hearing, the trial court denied the defendant's motion. Although the defendant did not argue during the first suppression hearing that he unequivocally requested counsel, the trial court commented that the defendant's statement regarding a lawyer "certainly does look equivocal, because it does look like Detective Freeman and Detective Shaw did make it clear to him that he didn't have to answer anything." In its written order denying the defendant's second motion to suppress, the trial court stated,

> Clearly the defendant ... did not make an unequivocal request for an attorney as is required under the United States and Tennessee Constitutions and as such the Chattanooga Police [o]fficers were free to continue to talk to him and any subsequent statement given by the defendant, Charles Nash, was freely and voluntarily given.

*State v. Nash*, 2009 WL at *1–3.

The following factual background is taken from the TCCA's opinion on appeal of Petitioner's petition for post-conviction relief:

> A jury convicted the Petitioner of first degree murder and especially aggravated robbery in October 2007. These charges arose out of the Petitioner's February 2006 armed robbery of the Okie Dokie Market in Chattanooga in which the clerk was shot and killed. The trial court sentenced the Petitioner to life imprisonment for the murder conviction and to a concurrent term of twenty-five years for the especially aggravated robbery conviction. This Court affirmed the Petitioner's convictions and sentence on direct appeal. *See State v. Charles Nash,* No. E2008–00951–CCA–R3–CD, 2009 WL 2461178, at *5 (Tenn.Crim.App. Aug.12, 2009), *perm. app. denied* (Tenn. Mar. 1, 2010).

> Because the direct appeal addressed only the trial court's denial of the Petitioner's motion to suppress, this Court's opinion does not contain a summary of the proof adduced at trial. The record of the trial is before us, however, and contains the Petitioner's statement to the police, which was admitted into evidence. The Petitioner explained that he robbed the store because a drug dealer had threatened to kill his grandmother if the Petitioner did not pay him

$10,000. During the robbery, he placed his gun on the store counter, and the clerk "tried to grab it." The Petitioner stated that the gun then "started going off," and he asserted that he "didn't even know the gun was loaded." The Petitioner thought the gun fired twice. He stated that he had had no intention of harming the clerk but that he just intended to rob the store. The record also includes testimony by Dr. Amy McMaster, who performed the autopsy on the store clerk shooting victim. Dr. McMaster testified that the victim had died as the result of multiple gunshot wounds: three that entered her back, one that entered her abdomen, and one that entered her left elbow. The three gunshots that entered the victim's back were fatal wounds. After his convictions were affirmed on direct appeal, the Petitioner filed the instant petition for post-conviction relief in August 2010. At the ensuing evidentiary hearing, the following proof was adduced:

The Petitioner's trial counsel ("Counsel") testified that he was licensed to practice law in both Tennessee and Georgia and that his practice consisted of "insurance defense litigation, business litigation and criminal defense work." As of the time of the hearing in 2012, he had been licensed for twenty years. At the time he was appointed to represent the Petitioner, he had participated in over one hundred trials.

Counsel was appointed to represent the Petitioner after the Petitioner developed a disagreement with his initial lawyer. Counsel obtained the Petitioner's file, including discovery, and gave copies of everything to the Petitioner to review while the Petitioner was in custody.

Counsel recalled that the Petitioner claimed to have committed the robbery in order to repay a debt. However, Counsel "never got to the point of being able to establish that as a factual matter." Counsel also was concerned that the debt resulted from illegal conduct, information which might prove harmful to the Petitioner's case in the jury's eyes.

On cross-examination, Counsel acknowledged that the Petitioner's statement to the police was "damning" and stated that it "dictated everything [they] did at trial." For that reason, he filed a motion to suppress, which was the second motion to suppress because the Petitioner's initial lawyer also had filed a motion to suppress. Counsel raised as grounds for suppression that, during the custodial interrogation, the Petitioner had requested counsel, but the interrogation nevertheless had continued.

Counsel stated that he was familiar with the United States Supreme Court case that ruled unconstitutional the police practice of interrogating suspects in custody before issuing *Miranda* warnings and then, after issuing the *Miranda* warnings, obtaining a second incriminating statement. Counsel also was aware that this practice had been used by the local police department. Counsel did not recall the Petitioner telling him that he had been interrogated while in custody *before* being given his *Miranda* warnings. Counsel testified, "it would shock me that [the Petitioner] had discussed a fact scenario just like that one in the Supreme Court and I had just walked away from it. It would shock me." Counsel added, "I can't believe I would have had that conversation and not taken note of that issue." Counsel explained that he was well aware of this issue because another police officer "does exactly that." Later in his testimony, Counsel reiterated, "I don't recall [the Petitioner] ever having discussion with me about him giving an inculpatory statement on the way to the police station, an un-Mirandized [statement]." Counsel acknowledged such a discussion could have occurred but asserted, "I was aware of the issue at the time and it boggles my mind to believe that I would have been told that and ignored the issue.["]

Counsel agreed that the prosecutor's argument to the jury that it was "time to tell [the Petitioner] that, [they], as a community, are not going tolerate this kind of behavior" was objectionable. Counsel also agreed that the prosecutor's argument that it was time for the jury "to tell [the Petitioner] that he is a murderer and a robber, the voice of this county, Hamilton County, the voice of St. Elmo, these actions are against the law and unacceptable" was objectionable. Counsel agreed that argument aimed at inflaming the jury was improper. Counsel acknowledged that he did not raise many objections during the prosecutor's closing argument, explaining that he was "more conservative with [his] objections than a lot of other criminal lawyers." Asked about other specific statements the prosecutor made during closing arguments, Counsel responded,

> You know, these things, you deal with them as you hear them. You hear it, you figure out what you think you need to do about it, how you can deal with it most effectively. In each instance, I dealt with what I heard in the way that I felt I was being most effective in his case.

Counsel agreed that he began the defense's closing argument "by pointing out that the [prosecution's] attempt to elicit emotion showed holes in the State's case."

Counsel stated that the defense strategy was to pursue a conviction of a lesser-included offense of first degree murder. He recalled discussing the potential defense of duress with the Petitioner. He anticipated proof of the Petitioner's claim that he committed the crime in response to threats to be admitted through the Petitioner's statement. He was not aware of other proof available to substantiate the Petitioner's claim. He did not recall discussing with the Petitioner the possibility of hiring a defense expert to "explicate to the jury how drug dealers operate when they've been ripped off or some of the power dynamics and potential threats relating to ripping off drug dealers." Counsel explained, "I understood what [the Petitioner] was saying and I understood what he wanted the jury to hear, but the fact of the matter is that as a legal defense, he wasn't close to duress." Counsel added, "I was not going to put myself in a position of establishing his role as a drug dealer by calling witnesses to that effect to present a legally unsustainable defense." Counsel testified that he did not request a jury instruction on duress because "[t]here was not factual proof in the record to support duress and [he] didn't introduce proof to support duress because it couldn't be legally supported." As to the elements of the duress defense, Counsel stated, "There certainly wasn't an immediate threat."

The Petitioner testified that, after he determined to turn himself in, he was picked up by Detective Freeman in an unmarked car. Det. Freeman handcuffed the Petitioner, placed him in the car, and then transported the Petitioner to the police station, a trip that lasted thirty to forty minutes. The Petitioner claimed that, during the drive, Det. Freeman questioned him both about his personal life and "regarding [the Petitioner's] activities in the case." Det. Freeman had not given the Petitioner his *Miranda* warnings.

The Petitioner testified that Det. Freeman first asked him about a previous robbery and whether he went into that store with a gun. The Petitioner told him that he had participated in a previous robbery and that he had been by himself. Det. Freeman then asked him about the instant robbery and whether the Petitioner had gone into the store with a gun. The Petitioner told him that he did not remember. Det. Freeman then asked him if he had left a water bottle on the counter of the store, and the Petitioner told him that he had. Det. Freeman continued to question him about the instant robbery, and the Petitioner "told him that [he] did commit the robbery." He also told the detective that he had had a gun. Det. Freeman asked the Petitioner about shooting the victim, and the Petitioner told him that he shot the victim twice. Upon further questioning, the Petitioner told Det. Freeman that he took the cash register and the surveillance tape out of the store; that he was wearing the clothes in which he

committed the robbery; and that he would give Det. Freeman the gun and the items he had taken out of the store. Once they arrived at the police station, Det. Freeman told him that he "needed ... to just repeat everything that [he] had said ... inside the car." Inside the station, the Petitioner was given his *Miranda* warnings, and he signed a waiver.

The Petitioner testified that he told Counsel about the initial questioning during the car ride. According to the Petitioner, Counsel did not ask him if he had been "*Mirandized*" but said, "oh, that's something we might have to look into."

The Petitioner testified that, prior to the two robberies he committed, a drug dealer had put a $10,000 bounty on him. He told Counsel about this and also provided the names of several persons who could corroborate this information to Counsel's private investigator. None of those persons were called to testify on his behalf.

On cross-examination, the Petitioner testified that he also told his first trial lawyer about Det. Freeman questioning him during the car ride. He stated that he did not know the name of the person who had put a bounty on him. He explained that the person threatened him directly but that he did not know the person's name. The threat was made within a month prior to the robbery.

Alex Freeman, a long-time friend of the Petitioner's, testified that, prior to the Petitioner's trial, Counsel's private investigator spoke with him about the Petitioner's charges. Freeman told the investigator the following:

> I heard from guys that was coming in the detention center [where Freeman was] and from several phone calls that I was making on the streets or whatever that [the Petitioner] was in trouble with a guy from ... the south area of the city where his grandma stayed at and he owed a lot of money and that if he don't pay the money back, that they going to kill his grandma, set the house on fire while she's in there, and then they were going to get him.

Freeman stated that he advised the Petitioner about these threats about two to three weeks before the robbery. The Petitioner told him, "I got to get this money because I love my grandmama." Freeman explained that the Petitioner's grandmother had raised him. The Petitioner sounded "scared." The investigator told Freeman that

they would contact him if they wanted him to testify, but they never did. Freeman stated that he had been willing to testify.

On cross-examination, Freeman stated that he did not know who was behind the threats, but "the guy that supposedly had the threat was like, not going to say wealthy, but he had enough money to make things happen if he wanted them to happen."

At the conclusion of proof, the post-conviction court took the matter under advisement and subsequently issued a comprehensive written order denying relief. As to the Petitioner's claim that Counsel was ineffective for failing to pursue the suppression of the Petitioner's statement on the grounds that it was taken in violation of *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), the post-conviction court specifically refused to accredit the Petitioner's testimony that he told Counsel that Det. Freeman had questioned him in the car prior to advising the Petitioner about his *Miranda* rights. Accordingly, the post-conviction court concluded that the Petitioner had failed to establish by clear and convincing evidence that Counsel had performed deficiently in this regard. As to the Petitioner's claim that Counsel was ineffective in failing to object to portions of the State's closing arguments, the post-conviction court concluded that the Petitioner had established neither deficient performance nor prejudice. As to the Petitioner's claim that Counsel performed deficiently in failing to adduce proof that the Petitioner had acted under duress, the post-conviction court determined that this defense had not been available at trial and, therefore, that prejudice had not been established.

*Nash v. State*, 2013 WL at *1–4 (footnotes omitted).

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), codified in 28 U.S.C. § 2254, *et. seq*., a court considering a habeas claim must defer to any decision by a state court concerning the claim, unless the state court's judgment: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1)–(2).

The § 2254(d) standard is a hard standard to satisfy. *Montgomery v. Bobby*, 654 F.3d 668, 676 (6th Cir. 2011) (noting that "§ 2254(d), as amended by AEDPA, is a purposefully demanding standard . . . 'because it was meant to be'") (quoting *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011)). Further, where findings of fact are supported by the record, they are entitled to a presumption of correctness which may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## IV. ANALYSIS

Petitioner's § 2254 habeas corpus petition [Doc. 1] raises various grounds for relief, some of which Petitioner has procedurally defaulted. The Court will address the procedurally defaulted claims before addressing the remaining claims in turn.

### A. **Procedurally Defaulted Claims**

First, Respondent argues that many of Petitioner's arguments are procedurally defaulted because Petitioner did not properly raise the claims in his direct appeal or in his appeal of the denial of his post-conviction relief. Specifically, Respondent alleges that Petitioner has procedurally defaulted the following ineffective assistance of counsel claims by not properly raising them in his appeal of the denial of his petition for post-conviction relief:

1. Trial counsel failed to properly investigate the background of one of the state's witnesses;

2. Trial counsel failed to withdraw a motion to consolidate;

3. Trial counsel failed to give Petitioner informed advice as to whether Petitioner should testify in his own defense;

4. Trial counsel failed to request the trial court to instruct the jury as to voluntary manslaughter and failed to properly raise this issue in motion for new trial; and

5. Trial counsel failed to raise the prosecution's suppression of the videotape of another robbery at a nearby store minutes before the robbery at issue.

[Doc. 12 p. 20–25].  Respondent also asserts that Petitioner's claims regarding prosecutorial misconduct were procedurally defaulted because Petitioner failed to raise them in his direct appeal and/or his appeal for post-conviction relief [Doc. 12 p. 25].  Respondent further argues that Petitioner procedurally defaulted his claim for ineffective assistance of post-conviction counsel based on counsel's failure to raise claims for ineffective assistance of trial counsel in his appeal of the denial of post-conviction relief [*Id.* at 27].

A petitioner who fails to raise his federal claim in the state courts and who is now barred by a state procedural rule from returning with the claim to those courts has committed a procedural default.  *See Coleman v. Thompson*, 501 U.S. 722, 732 (1991).  A procedural default forecloses federal habeas review, unless a petitioner can show cause to excuse his failure to comply with the state procedural rule and actual prejudice resulting from the alleged constitutional violation.  *Id*. at 732.  If a 2254 petitioner failed to raise a claim on appeal and thereby violated a state procedural rule, "that claim is subject to procedural default and will not be reviewed by federal courts unless the petitioner demonstrates cause and prejudice for the default."  *West v. Carpenter*, 790 F.3d 693, 697 (6th Cir. 2015).

An attorney's ineffective assistance in post-conviction proceedings generally does not establish "cause" to overcome procedural default of claims.  *Coleman*, 501 U.S. at 755(1991).  Where a 2254 petitioner could only raise a claim for a trial attorney's ineffective assistance of counsel for the first time in post-conviction proceedings, however, ineffective assistance of post-conviction counsel may be "cause" to excuse the procedural default of such a claim.  *Wallace v. Sexton*, 570 F. App'x 443, 452–53 (6th Cir. 2014); *Trevino v. Thaler*, 133 S.Ct. 1911, 1918–21 (2013); *Martinez v. Ryan*, 132 S. Ct. 1309, 1320 (2012).  This exception applies to post-conviction proceedings in Tennessee.  *Sutton v. Carpenter*, 745 F.3d 787, 792–95 (6th Cir. 2014).  A petitioner

cannot use this exception to establish cause to excuse his default of an ineffective assistance of counsel claim where the alleged ineffective assistance of post-conviction counsel occurred on appeal of the post-conviction petition, however, as that was not the first occasion in which the petitioner could have raised the ineffective assistance of counsel claim. *Wallace*, 570 F. App'x at 453.

As set forth above, Petitioner did not properly raise the above-listed claims for ineffective assistance of counsel in his appeal of the denial of his post-conviction petition. Petitioner likewise did not raise his prosecutorial misconduct claims in his direct or post-conviction appeals. Also, the *Martinez* exception does not apply to Petitioner's claim for ineffective assistance of post-conviction counsel in his appeal of the denial of his petition for post-conviction relief. Accordingly, Petitioner's above-listed claims for ineffective assistance of trial counsel, claims for prosecutorial misconduct, and claim for ineffective assistance of post-conviction counsel are procedurally defaulted and they will be **DISMISSED**.

**B.  Suppression of Petitioner's Statement to Police**

In this claim, Petitioner asserts that his statement to police was obtained in violation of the Fifth Amendment's protection against self-incrimination because he "unequivocally invoked his right to counsel before beginning that statement" [Doc. 1 p. 5]. As set forth above, the relevant portion of the state court record establishes that the following colloquy took place between Petitioner and police prior to Petitioner giving police a statement in which he incriminated himself with regard to the charges against him:

> [DET. FREEMAN]:  . . . .  Here's the rights waiver form showing you, just read over that like I just read it and if you want to talk to me just initial every place right there and then sign and date it right there.
> (*silence* )

[DET. FREEMAN]: I explained to you also that we were gonna fingerprint you and take your pictures and stuff like that, right? Okay. And you stated that you would like to do that first? Or do you want to continue with this right now?

[DET. SHAW]: Hey, I want to go to the john first.

[DET. FREEMAN]: Okay. Hold on just a second, let me see if he's gonna sign that Rights Waiver Form.

[DEFENDANT]: Is it ... uh ... it ain't possible that I could have a lawyer?

[DET. FREEMAN]: Yeah, That's ... and if you want to answer some questions now you can always get a lawyer then or now, whatever, just like what it's saying here but if you want to start talking and then if you decide if you want to stop that's fine too.

[DEFENDANT]: I just want to get on tape that I ain't kill that lady.

[DET. FREEMAN]: Okay. Well, I would like for you to initial and ... and then sign first.

[DEFENDANT]: Uh ...

[DET. SHAW]: The way ... the way this law works, it's called the Miranda Law, okay.

[DEFENDANT]: Uh-hum (yes).

[DET. SHAW]: This guy that got arrested ... he confessed to a crime and then when it came time for court he said well I didn't know I didn't have to say anything so that's why they make us read this to you now.

[DEFENDANT]: Yeah.

[DET. SHAW]: Just so you understand that basically you don't have to answer every question that we ask you. You can answer some of them and not others. You don't have to answer any questions if you don't want but if you want to answer some of them and not others or if you want to tell your side of the story and not answer any questions you can do that too. But before we can listen to you or anything else you have to sign saying you understand what your rights are and you're willing to speak about it even if it's just to tell your side of the story and not to answer questions that's your ... prerogative.

*State v. Nash*, No. E2008-00951-CCA-R3-CD, 2009 WL 2461178, at *2 (Tenn. Crim. App. Aug. 12, 2009). The TCCA found that Petitioner's question of whether "it ain't possible that I could have a lawyer?" was not an unequivocal invocation of his right to counsel and therefore the admission of the subsequent statements from Petitioner did not violate Petitioner's constitutional rights, relying on both Tennessee and Supreme Court law. *Id.* at 4–5.

The Fifth Amendment guarantees that an individual has the right to not be "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Accordingly, the Supreme Court has held that any suspect must be informed of his Fifth Amendment right against self-incrimination, among other rights, prior to custodial interrogation by police. *Miranda v. Arizona*, 384 U.S. 436, 478–89. Further, once a suspect asserts his right to counsel, he may not be interrogated outside counsel's presence "unless the accused himself institutes further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). In *Davis v. United States*, however, the Supreme Court clarified that nothing prevents police from questioning a suspect "when the suspect *might* want a lawyer. Unless the suspect actually requests an attorney, questioning may continue." *Davis v. United States*, 512 U.S. 452, 462 (1994). Accordingly, the *Davis* Court affirmed the lower courts' findings that a suspect's statement that "'[m]aybe I should talk to a lawyer'—was not a request for counsel." *Id.*; *see also Rogers v. Kerns*, 485 F. App'x 24, 31 (6th Cir. 2012) (holding that a suspect's question of "I can't write this with a lawyer or anybody[?]" would lead a reasonable police officer to understand only that the suspect might be invoking his right to counsel, especially in light of the suspect's subsequent statement that he was "just asking" and therefore affirming the state court's denial of § 2254 relief to the suspect).

Like the statements of the suspects in *Davis* and *Rogers*, Petitioner's question asking whether it was possible for him to have a lawyer did not unequivocally invoke his right to counsel prior to questioning. Moreover, Petitioner's follow-up statement that he just wanted "to get on tape that [he] ain't kill that lady" was a clear indication that Petitioner did wish to speak to police, and the police explained that he could do so without answering questions if he wished. Accordingly, the state courts reasonably determined that Petitioner did not unequivocally request

counsel, that Petitioner's statement to police did not violate Petitioner's Fifth Amendment right against self-incrimination, and that Petitioner therefore was not entitled to suppression of his confession on this ground and Petitioner is likewise not entitled to § 2254 relief on this claim.

## C. Ineffective Assistance of Counsel

Petitioner also asserts claims for ineffective assistance of trial counsel arising out of the assertions that trial counsel failed to investigate and properly argue his motion to suppress Petitioner's statement to police, failed to object to or request a mistrial because of prosecutorial misconduct and statements, and failed to present duress/necessity as a defense.

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. A defendant has a Sixth Amendment right not just to counsel, but to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the Supreme Court set forth a two-pronged test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687. Petitioner has the burden of showing both deficient performance and prejudice. *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000).

Under the first prong of the test, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. A defendant

asserting a claim of ineffective assistance must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).

The second prong requires the petitioner to show that counsel's deficient performance prejudiced the defense. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. In order to prevail on a claim of prejudice, a petitioner must show "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. While both prongs must be established to meet a petitioner's burden, if "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.* at 697.

Review of a *Strickland* claim under § 2254(d)(1) is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123, 129 S.Ct. 1411, 1420 (2009). Further, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable," but instead "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 131 S.Ct. 770, 788 (2011).

The Court will address Petitioner's remaining ineffective assistance of counsel claims in turn, applying the above standard.

### 1. <u>Motion to Suppress</u>

In this claim, Petitioner asserts that trial counsel failed to argue that Petitioner's statement to police should have been suppressed under *Missouri v. Seibert*, 542 U.S. 600 (2014) due to

Petitioner's assertion that he was questioned and confessed before officers gave Petitioner *Miranda* warnings [Doc. 1 p. 6]. In *Seibert*, the Supreme Court found that a police officer's act of interrogating a suspect prior to giving *Miranda* warnings, giving the suspect *Miranda* warnings "midstream," and then asking similar questions to have the suspect restate his pre-*Miranda* admissions was improper. *Seibert*, 542 U.S. at 604. Accordingly, the Court held that, in such situations, all pre-and post-*Miranda* statements must be suppressed. *Seibert*, 542 U.S. at 608–9, 617.

As set forth above, the state post-conviction court held a hearing on this claim at which both Petitioner and his attorney testified as to their recollections of Petitioner's statements to counsel regarding this alleged pre-*Miranda* questioning, if any [State Court Attachment 17 p. 52, 54–55; Attachment 20 p. 29–34, 94–104]. *Nash v. State*, No. E2012-02511-CCA-R3, 2013 WL 5314599, at *2–3, 7 (Tenn. Crim. App. Sept. 20, 2013). In determining that Petitioner was not entitled to relief on this claim, the post-conviction court examined the record, including Petitioner and counsel's testimony, and found that counsel was not deficient for failing to seek suppression of Petitioner's statement under *Seibert* [State Court Attachment 17 p. 60]. *Id.* at 7. It is apparent from the post-conviction court's memorandum findings on this claim that the court found that Petitioner's statements that he had told his counsel about this pre-*Miranda* questioning were not credible in light of the record as a whole [State Court Attachment 17 p. 60]. *Id.*

Habeas courts generally defer to trial court credibility findings, as the trial court is in the best position to determine witness credibility. *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003); *see also Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) (holding that § 2254 does not give habeas courts "license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them"). Even where reasonable minds could disagree about the

credibility of a witness, that reasonable disagreement is not sufficient to allow the habeas court to override the trial court's determination as to credibility. *Rice v. Collins*, 546 U.S. 333, 341–42 (2006). A habeas court may, however, overturn a trial court's credibility determination where the evidence is so powerful that the only possible conclusion is that the trial court was incorrect. *Miller-El v. Dretke*, 454 U.S. 231, 265 (2005).

As the record supports the trial court's finding that counsel was not deficient for not seeking suppression of Petitioner's statement pursuant to *Seibert* and the Court is not in a position to second-guess the post-conviction court's determinations on witness credibility, Petitioner is not entitled to relief on this ineffective assistance claim.

### 2. Failure to Object to and/or Request a Mistrial Based upon Prosecutorial Statements

In this claim, Petitioner asserts that counsel was deficient for not objecting to and/or requesting a mistrial due to various statements of the prosecutor during closing statements. The record demonstrates as follows regarding counsel's testimony about this claim at the post-conviction hearing:

> Counsel agreed that the prosecutor's argument to the jury that it was "time to tell [the Petitioner] that, [they], as a community, are not going tolerate this kind of behavior" was objectionable. Counsel also agreed that the prosecutor's argument that it was time for the jury "to tell [the Petitioner] that he is a murderer and a robber, the voice of this county, Hamilton County, the voice of St. Elmo, these actions are against the law and unacceptable" was objectionable. Counsel agreed that argument aimed at inflaming the jury was improper. Counsel acknowledged that he did not raise many objections during the prosecutor's closing argument, explaining that he was "more conservative with [his] objections than a lot of other criminal lawyers." Asked about other specific statements the prosecutor made during closing arguments, Counsel responded,
>
> > You know, these things, you deal with them as you hear them. You hear it, you figure out what you think you need to do about it, how you can deal with it most

19

> effectively. In each instance, I dealt with what I
> heard in the way that I felt I was being most effective
> in his case.
>
> Counsel agreed that he began the defense's closing argument "by
> pointing out that the [prosecution's] attempt to elicit emotion
> showed holes in the State's case."

[State Court Attachment 20 p. 35–60]; *Nash v. State*, 2013 WL at *2–3.

The parties disagree about the legal standard the Court should apply to this claim. Specifically, Petitioner asserts that the Sixth Circuit's analysis in *Hodge v. Hurley*, 426 F.3d 368, 385–389 (6th Cir. 2005) should guide the Court's analysis of this claim [Doc. 18 p. 10–11], while Respondent relies on *Searcy v. Berguis*, 549 F. App'x 357, 362 (6th Cir. 2013) [Doc. 12 p. 18–19]. In *Hodge*, the Sixth Circuit applied the *Strickland* standard to counsel's failure to object to the prosecution's closing statement and found that counsel's failure to do so amounted to ineffective assistance of counsel. *Hodge*, 426 F.3d at 375–389. In *Searcy*, on the other hand, the Sixth Circuit noted that, although the petitioner's counsel did not object to questionable statements in the prosecution's closing argument, counsel did address the objectionable statements in his closing argument. *Searcy*, 549 F. App'x at 362. Accordingly, the *Searcy* court held that they would not second-guess that strategy and that the petitioner would not be entitled to relief on this claim. *Id*.

The Court finds that *Searcy* is more applicable to the instant case, as in both *Searcy* and the case at bar, counsel chose to address objectionable conduct of the prosecution in its closing argument in his closing argument, rather than in objections. Even if the Court relies upon the analysis of the *Hodge* court as requested by Petitioner, however, Petitioner has not established that counsel was deficient, as this case is substantively distinguishable from *Hodge*.

Specifically, in *Hodge*, the Sixth Circuit held that where the following occurred in the prosecution's closing, counsel's failure to object thereto established that the defendant was entitled to § 2254 relief:

> the prosecutor accused [the defendant] of "lying"; stated that the complaining witness was "absolutely believable"; accused Dr. Steiner of testifying "wrongfully" and "unethically," and telling "a lie"; stated that defense counsel was telling "a lie"; severely misrepresented the testimony of Dr. Omley, the examining physician; stated (incorrectly) that a finding in favor of Hodge required a finding that Fenn's great-grandmother and great-aunt were "absolute liars"; suggested (without any evidence) that Hodge was a frequent underage drinker; insinuated (without any evidence) that Hodge wanted to get part of the prosecutor's family's Social Security checks; suggested that Hodge was the type of person the jury should fear running into at night; and generally argued that the jury should convict Hodge on the basis of his bad character.

*Hodge*, 426 F.3d at 386. The Sixth Circuit found that the non-bad character statements listed above were harmful to the petitioner's case "because they were false, unsupported, or misleading" and that the bad character statements were "sufficiently egregious to warrant, at a minimum, an objection at the bench following the conclusion of the prosecution's rebuttal argument." *Id.* at 387. The petitioner's counsel, however, "sat idly by" while these comments were made. *Id.* at 372. As such, the Sixth Circuit found that the comments established both deficient performance and prejudice and that the trial court's decision that the petitioner was not entitled to relief based thereon was objectively unreasonable. *Id.* at 387–88. Nothing in the *Hodge* opinion suggests that the petitioner's counsel made any attempt to discount or address these objectionable statements in his closing argument or otherwise.

While the comments of the prosecution in this case were objectionable, they did not reach the level of those at issue in *Hodge*. Specifically, unlike the comments of the prosecutor in *Hodge*, the comments of the prosecutor in the case at bar did not impugn the credibility of witnesses based

on the implied notion that the prosecutor had personal knowledge thereof, nor did the comments set forth unsupported factual assertions about Petitioner. Moreover, although the comments of the prosecution at issue were emotional arguments that were likely objectionable, the state courts' determination that counsel's decision to point out that the emotional appeals demonstrated holes in the prosecution's case in his closing statement, rather than object, was not deficient or prejudicial was not objectively unreasonable. Rather, the record supports finding that counsel's decision to discount these statements in closing argument, instead of through objections, may have been sound trial strategy, which the Court declines to second-guess. *Searcy*, 549 F. App'x at 362.

Accordingly, the Court finds that Petitioner is not entitled to relief on this ineffective assistance of counsel claim.

### 3. **Failure to Present Duress/Necessity Defense**

In this claim, Petitioner asserts that counsel was deficient for not asserting a defense of duress based upon Petitioner's statements to counsel that he committed the subject burglary only because he owed a local drug dealer money and the drug dealer had threatened Petitioner's grandmother's life if he did not pay the debt [Doc. 1 p. 10]. Tenn. Code Ann. § 39-11-504 sets forth when this defense is available:

> (a) Duress is a defense to prosecution where the person or a third person is threatened with harm that is present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh the harm sought to be prevented by the law proscribing the conduct, according to ordinary standards of reasonableness.

At the post-conviction hearing, both Petitioner and a friend of his testified as to the threat against Petitioner arising out of the alleged debt [State Court Attachment 20 p. 106–11, 150–58]. The

relevant testimony of Petitioner's friend was that he had heard from others that Petitioner's grandmother would be killed if Petitioner did not pay the debt, that he communicated this threat to Petitioner, and that Petitioner sounded scared [*Id.* at 151–54]. Further, Petitioner testified in relevant part that the communication of this threat from his friend and others made him afraid for his life and his grandmother's life [*Id*. at 109–11].

Nothing in the record suggests, however, that the threatened harm on which this claim was based was present, imminent, impending, or continuous as required to establish the duress defense under Tennessee law. Accordingly, the Court finds that Petitioner has not established that this defense was available to him or that counsel was deficient for not presenting this defense and he is not entitled to relief on this claim for ineffective assistance.

### D.  Ineffective Assistance of Appellate Counsel

Petitioner also asserts that appellate counsel was ineffective for not raising the issue of prosecutorial misconduct on appeal. The TCCA held that Petitioner was not entitled to relief on this claim, as he had not demonstrated that he was prejudiced by appellate counsel's failure to bring this argument, nothing suggested that the improper statements affected the verdict, and Petitioner therefore would not have been entitled to relief on such a claim. *Nash v. State*, No. E2012-02511-CCA-R3, 2013 WL 5314599, at *7 (Tenn. Crim. App. Sept. 20, 2013).

In accordance with the Court's above finding that trial counsel's choice to address the objectionable statements in his closing statement, rather than through objections, may have been sound strategy, the Court finds that Petitioner has not met his burden to establish that appellate counsel was deficient for not setting forth an ineffective assistance of claim based thereon. As such, the state court's determination of this issue was objectively reasonable and Petitioner is not entitled to relief on this claim for ineffective assistance.

## V.    CONCLUSION

As set forth above, Petitioner's motion to ascertain status of the case [Doc. 20] will be **GRANTED** to the extent that this memorandum opinion and a judgment order will enter. Likewise, Respondent's motion to substitute attorney [Doc. 21] will be **GRANTED** for good cause shown therein and Petitioner's motion to substitute part [Doc. 23] will be **GRANTED**.

For the reasons set forth above, however, the Court finds that none of Petitioner's claims warrant issuance of a writ.  Therefore, Petitioner's petitions for a writ of habeas corpus [Doc. 1] will be **DENIED** and this action will be **DISMISSED WITH PREJUDICE.**

## VI.    CERTIFICATE OF APPEALABILITY

The Court must consider whether to issue a COA, should Petitioner file a notice of appeal. Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a final order in a habeas proceeding only if he is issued a COA, and a COA may only be issued where a Petitioner has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).  When a district court denies a habeas petition on a procedural basis without reaching the underlying claim, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Where the court dismissed a claim on the merits, but reasonable jurists could conclude the issues raised are adequate to deserve further review, the petitioner has made a substantial showing of the denial of a constitutional right.  *See Miller-El v. Cockrell*, 537 U.S. 322, 327, 336 (2003); *Slack*, 529 U.S. at 484.

After reviewing each of Petitioner's claims, the Court finds that Petitioner has not made a substantial showing of the denial of a constitutional right as to any claims.  Specifically, as the

procedurally defaulted claims, jurists of reason would not debate the Court's finding that the claims are procedurally defaulted. Further, as to the claims that Petitioner did not procedurally default, Petitioner has not shown that admission of his statement to police violated his Fifth Amendment right against self-incrimination or that counsel was deficient at trial and/or on appeal. Accordingly, a COA **SHALL NOT ISSUE**.

      **AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**

      **ENTER**:

_/s/ Harry S. Mattice, Jr._
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE
